# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

ALBANI LOPEZ,                                          :
                            Plaintiff,                 :
                                                       :
                            v.                         :          C.A. No. 13-597ML
                                                       :
CAROLYN W. COLVIN, ACTING                              :
COMMISSIONER OF SOCIAL SECURITY,                       :
                            Defendant.                 :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

      Following a harrowing family tragedy resulting from the discovery of a sexual

relationship[1] between her sixteen-year-old daughter and common-law husband of fourteen years,

Plaintiff Albani Lopez filed for Disability Insurance Benefits ("DIB") on October 4, 2010, based

on the claim that she has been unable to work since January 1, 2011, due to debilitating

depression and acute attacks of gastritis linked to depression and anxiety, exacerbated by both

the side effects of her psychiatric medications and the symptoms of and treatment for chronic

anemia.[2]  Tr. 69.  She has filed a motion for reversal of the decision of the Commissioner of

Social Security (the "Commissioner") denying DIB under 42 U.S.C. § 405(g), arguing that the

determination of the Administrative Law Judge ("ALJ") that her mental impairment is not

disabling was infected by error and not supported by substantial evidence.  Defendant Carolyn

W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

---

[1] The medical record is ambiguous regarding whether the relationship was consensual or involved rape.  See Tr. 580.
This is beside the point – what matters is the devastating impact the discovery, and what followed the discovery, had
on Plaintiff.

[2] In her application, Plaintiff alleged other impairments: migraines, muscle spasms, allergies and asthma.  Tr. 69.
None is the subject of this appeal; they will not be discussed further in this report and recommendation.

These motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). I find that the ALJ's decision is tainted by error. Accordingly, I recommend that Plaintiff's motion for remand be granted and that the Commissioner's motion for affirmance be denied.

## I.  <u>Background Facts</u>

Plaintiff Albani Lopez was forty-five on January 1, 2011, the alleged onset date of disability.[3]  Tr. 39, 156. She grew up in the Dominican Republic where she completed the twelfth grade; she has been in the United States since she was nineteen. Tr. 45, 201, 203, 376. She speaks a little English, though not enough to have a conversation, and cannot read English well enough to read a children's book. Tr. 46-47.

From 1983 until 2000, Plaintiff was employed as a hairdresser. Tr. 203. In 2001, she opened her own salon, Albany Unisex Hair Salon, Inc., where she worked until September 15, 2010; in addition to working with clients, she also managed the business. Tr. 167-69, 172, 187. From 1997 through 2010, she earned between $8,312 and $11,177 per year except for 2009, when she earned $6,200, and 2001, when she earned $51,302. Tr. 166-69. After the family disaster that triggered her depression began to unfold in December 2009, she repeatedly attempted to return to work and finally stopped working entirely in the fall of 2010; she also was unable to manage the business because of her illness. Tr. 187, 202, 405-06. Since then, her son, later assisted by her daughter, has managed the salon and its two barbers. Tr. 33. Plaintiff has retained ownership but, apart from her electronic signature typed on the 2011 tax return, has had no involvement in any aspect of the running of the business. Tr. 47-49, 173.

---

[3] Plaintiff's application initially alleged that the onset of disability was May 1, 2009. Tr. 15, 69. At the hearing, for reasons not disclosed on the record, she amended the onset date to January 1, 2011, which is after the filing of the application on October 4, 2010. Tr. 39.

For several years prior to the horrific personal events that appear to have triggered her mental illness, Plaintiff suffered from chronic gastritis and other abdominal pain, for which she was repeatedly hospitalized; in all, she had three surgeries related to abdominal pain prior to onset. See, e.g., Tr. 217, 245, 263, 346. She also suffered from "a long history of anemia," but cannot take iron or calcium by mouth because of her gastritis. Tr. 417. Despite these difficulties, she continued both to run her salon and to work there as a hair stylist. Tr. 49, 187.

In December 2009, her life catastrophically changed when her daughter disclosed that Plaintiff's long-time life partner had forced her into a sexual relationship. Tr. 376, 382. This revelation set in motion a swirl of events, leading to Plaintiff's temporary loss of her daughter (who was removed from the home and ultimately returned to Florida to live with Plaintiff's ex-husband) and permanent loss of her common-law husband. Tr. 415. Plaintiff, who initially did not believe her daughter's report, experienced crushing guilt, became "tormented" with "finding the truth," turned to religion to find comfort and sank into depression. Tr. 402, 415. She reported later that she attempted suicide in December 2009 when she "took all my pills," had to be revived and was hospitalized, although there is no medical record from any hospital for that period, so the report cannot be corroborated.[4] Tr. 415.

As these events were unfolding, Plaintiff became isolated and began to experience lack of energy, crying, disrupted sleep and constant rumination, yet she reported feeling better "when at work or church." Tr. 415. Nevertheless, two days after this seemingly optimistic report, on April 15, 2010, Dr. Andrew Busch sent her to the emergency room and she was admitted to the Rhode Island Hospital psychiatric unit with suicidal ideation and severe depression; in all, she

---

[4] The Adult Initial Psychiatric Evaluation Report from Rhode Island Hospital on April 15, 2010, notes, "Pt reports ODing in 12/2010 [sic] + requiring resuscitation." Tr. 376. The April 21, 2010, discharge summary from Rhode Island Hospital states, "Records indicate a prior suicide attempt by overdose but she denies this on interview." Tr. 387.

was hospitalized for seven days. Tr. 374-82, 580-88. A psychiatric evaluation performed at intake found that she suffered from "neurovegetative sxs of depression + ruminates on suicide;" at Axis V, she was assessed as functioning at a GAF level of 30.[5] Tr. 376-81. At discharge seven days later, she was assessed as stable with "brighter and more reactive" affect and a GAF of 50. Tr. 389.

Following this hospitalization, Plaintiff began treating regularly with Dr. Busch, a psychologist with the Rhode Island Free Clinic, who had therapy sessions with her every two to three weeks. Over the next two years, she saw him a total of twenty-seven times. See, e.g., Tr. 396-400, 402-16, 673, 679-83. In addition, in August 2010, she began regularly to see Dr. Patricia Wold, the psychiatrist at the Rhode Island Free Clinic, every few months (nine times over the ensuing two-year period). Tr. 401, 672, 674, 676, 677, 679, 684, 687, 692. An array of psychiatric medications were prescribed, many with side effects that include fatigue, drowsiness and abdominal pain. Tr. 405 (Dr. Busch notes antidepression medication causes fatigue); Tr. 482, 486, 496 (Dr. Wold opines that medications cause drowsiness); see Tr. 684 (Dr. Wold notes antidepression medication triggers GI distress).

Initially, after the hospitalization, Plaintiff's mental status seemed somewhat improved. In May 2010, she was going to work and visiting family; she also went to Florida to see her daughter. Tr. 409-12. By July 2010, Dr. Busch was urging her to take "'baby steps' back to old

---

[5] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting Diagnostic and Statistical Manual of Mental Disorders [Text Revision 4th ed. 2000] ["DSM-IV-TR"] at 32). A GAF between 21-30 denotes serious impairment and inability to function in almost all areas, while a score of 41 to 50 indicates "serious symptoms." DSM-IV-TR at 34; see also Bowden v. Astrue, No. CA 11-84 DLM, 2012 WL 1999469, at *3 n.4 (D.R.I. June 4, 2012). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-5").

life, including working more each week." Tr. 405. However, in August 2010, her isolation and complete lack of energy increased and she essentially stopped working. Tr. 401-03; see Tr. 157 ("I have not worked since 09/2010"). When she tried to return to work, her attempts triggered the onset of debilitating gastritis or were undermined by fatigue. Tr. 684 (November 2011, attempt to work failed due to fatigue); Tr. 685 (GI "pain started following her first full day at work in several months"). Dr. Busch concluded that the attacks of gastritis appeared to be linked to Plaintiff's "anxiety/rumination." Tr. 685. He wrote: "[i]t appears possible that the pt's GI pain itself is functional (allows her to avoid responsibilities, etc.)." Id.; see also Tr. 674 (Dr. Wold notes two-week hospitalization for gastritis pain and opines family tension worsens her GI symptoms).

Dr. Busch initially saw Plaintiff's willingness to leave the house to go to church as positive, a way for her to cope with unfolding events. Tr. 402 (urging her to leave house if only to go to church); Tr. 415 (immediately prior to hospitalization in April 2010, noting that church "helps her feel less depressed"). However, by 2011, his notes reflect that her daily and sometimes twice-daily church attendance, to the exclusion of any other activities, had become a symptom of her illness; in therapy, he was working with her to reduce the hours spent in church. See, e.g., Tr. 535 ("limiting her life to . . . church and home . . . will cause her to continue to be depressed"); Tr. 685 ("Pt reported spending somewhat less time at church (down to 10-12 hours per week")); Tr. 683 ("Discussed whether attending church services 2[indecipherable]0 hrs per week is still effective for her"). For example, in August 2011, he recorded that she continued to complain of fatigue and poor memory/concentration and "spending most of her days in church praying that she can 'find the truth' re her daughter and ex-husband's relationship;" he counseled her regarding the futility and "costs (no energy to focus on other needs)" of this "search for the

truth." Tr. 678.  In January 2012, he noted that her persistent avoidance of leaving the house

except to attend church daily "is maintain [sic] her depression."  Tr. 688; see also Tr. 690

("Discussed how limiting her life to places she feels comfortable [i.e. church and home] will

cause her to continue to be depressed").

Dr. Busch's observations are mirrored in Plaintiff's DIB application.  During her

application interview on October 15, 2010, the interviewer noted that she had difficulty

answering questions and was crying at the beginning of the interview and that her expression

seemed to lack feeling.  Tr. 192.  In the application itself, Plaintiff described a life limited to her

home except for hours spent at church.  Tr. 210.  She reported that she cannot sleep, is restless

and anxious and has no desire to initiate any activity.  Tr. 211.  Despite little desire and lack of

motivation, she is still able – occasionally – to prepare very simple meals but not to do household

chores.  She also can shop for food, Tr. 212, but the side effects of her antidepression

medications have limited her ability to drive herself because they make her "very sleepy" and

"out of it."  Tr. 45.  She has tried to function without medication so that she can work, but

became very nervous and began hearing voices.  Tr. 45.  Her only hobby is watching TV, which

she does only a few times a week because she has lost interest.  Tr. 214.  She claimed that she

"feel[s] like an outcast," and is lightheaded, mentally confused and unable to concentrate.  Tr.

215.

Plaintiff's treating psychiatrist, Dr. Wold, completed three assessment forms – two in

2011 and one in 2012 – and wrote a letter setting out her opinion of Plaintiff's functional

limitations arising from her depression in combination with her physical symptoms.  Tr. 481-84

(Mar. 8, 2011); Tr. 485-89 (Apr. 5, 2011); Tr. 495-98 (Apr. 12, 2012).  All three conclude that

Plaintiff is unable to sustain competitive employment.  Tr. 482, 486, 496.  In the 2011

questionnaires, Dr. Wold rated Plaintiff's overall symptoms as "severe," Tr. 481, 485; in April

2012, she assessed them as "moderate." Tr. 495. All three of Dr. Wold's completed

questionnaires consistently label Plaintiff as having "severe"[6] or "moderately severe" limitations

in her social functioning and her ability to relate to other people, respond to supervision, attend

and concentrate in the work setting and respond to customary work pressures (attendance,

persistence, pace and productivity). Tr. 483, 487, 497. Dr. Wold noted that severe anemia

requiring intravenous medication, Tr. 488, fatigue, Tr. 482, and frequent hospitalizations for

abdominal pain, Tr. 498, exacerbate her condition. In her April 2011 letter, Dr. Wold wrote that

medication has "moderated her depression but her fatigue and pain in her arm remain." Tr. 489.

## II.    Travel of the Case

Plaintiff filed her DIB application on October 4, 2010. Tr. 15, 69. Soon after it was

filed, state agency consultant, Jeffrey Hughes, Ph.D., reviewed the file and prepared a psychiatric

assessment dated November 24, 2010. Tr. 72-73, 75-77. Relying principally on records from

Plaintiff's psychiatric hospitalization in April 2010 and her temporarily improved mental status

afterwards, all of which is from the period prior to her alleged onset of disability, Dr. Hughes

opined that Plaintiff suffered from severe affective disorder and chronic anemia but that she

could perform simple and complex tasks in the workplace setting and that she had "moderate"

restrictions on her activities of daily living and social functioning, including her ability to

interact with the general public. Tr. 73, 76. On December 28, 2010, a physical assessment, also

based on a file review, was procured from Dr. Lewis Cylus, who concluded that Plaintiff's

gastritis attacks each were severe, particularly those that led to surgeries in 2008 and twice in

2009, but that the "severity of which [sic] each did not last 12 months." Tr. 72, 74-75.

---

[6] As defined on the forms Dr. Wold completed, "moderately severe" means "an impairment which seriously affects ability to function" while "severe" means an "extreme impairment of the ability to function." Tr. 484.

Plaintiff's claim was initially denied on January 10, 2011. Tr. 79. On reconsideration, state agency consultant, Marsha Hahn, Ph.D., reviewed the file and prepared a second psychiatric assessment dated April 20, 2011. Tr. 86-87, 89-90. Although Dr. Hahn looked at the '[n]ewly submitted emotional questionnaire completed by Dr. Wold," Tr. 86, her report mistakenly labels Dr. Wold as Plaintiff's "PCP" (primary care physician). Id. Moreover, virtually all of Dr. Wold's treatment notes and most of Dr. Busch's post-onset treatment notes were added to the record well after Dr. Hahn's review, as they were all part of a post-hearing submission.[7] As a result, Dr. Hahn did not see them.

With virtually no mental health treatment notes from the relevant period, Dr. Hahn ignored Dr. Wold's conclusion that Plaintiff had moderately severe or severe impairments in social functioning and in her ability to relate to other people, respond to supervision, sustain attention and concentration in a work setting and respond to customary work pressures (attendance, persistence, pace, productivity). Rather she focused only on the functions as to which Dr. Wold opined that Plaintiff had moderate limitations (constriction of interests, activities of daily living, interaction with co-workers and performing simple tasks). Id. Without the benefit of an examination of Plaintiff, Dr. Hahn found only "moderate" restrictions on Plaintiff's social functioning and her ability to maintain attention and concentrate, work with others and interact with the general public. Tr. 81-92. Noting that Plaintiff's application reflected some ability occasionally to prepare simple meals, drive, shop for food and manage money, Dr. Hahn

---

[7] At the hearing, the ALJ noted that "we have Dr. Wold's opinion but not the supporting records and I had agreed to keep the record open 14 days for that." Tr. 36, 38. The newly submitted exhibit (Tr. 672-92) consists of virtually all of the treatment notes of Dr. Busch and Dr. Wold for 2011 and 2012; it was submitted timely and received in evidence. Tr. 32. Only Dr. Wold's notes from her first appointment with Plaintiff in 2010 and, for the post-onset period, only one note written by Dr. Busch during 2012 were in the record reviewed by Dr. Hahn; the rest were in the post-hearing submission. Tr. 535.

concluded that, while Plaintiff may "struggle with attention and concentration occasionally," she "can finish simple tasks over the course of a normal 8/5/40 work routine." Tr. 89.

Plaintiff's application for reconsideration was denied on May 19, 2011. Tr. 100. She requested a hearing with an ALJ, which was held on May 18, 2012. Tr. 34. Plaintiff, represented by counsel, and a vocational expert appeared and testified. Tr. 34-67. On June 6, 2012, the ALJ issued his written decision finding that Plaintiff had not been under a disability since January 1, 2011, her alleged onset date. Tr. 9-27. The administrative stage of the proceedings became final when, on June 19, 2013, the Appeals Council denied her request for review of the ALJ's decision. Tr. 1-5. Plaintiff timely appealed to this Court on August 19, 2013.

## III.    **The ALJ's Hearing and Decision**

### A.    **The ALJ's Hearing**

The hearing began with the amendment of the onset date to January 1, 2011. Tr. 39. Most of the hearing focused on the ALJ's examination of Plaintiff regarding her ownership of and involvement with her salon, daily activities and mental impairments. Tr. 36-59. She confirmed that she has been living with her daughter, who helps her with the household bills and chores, while her son runs the salon. Tr. 54, 55, 58. She testified that "when I started getting sick I kept working;" only when the events triggered by her "ex-partner, raping [her] daughter" began unfolding did she find that she was unable to go back to work: "[m]y nerves were totally out of control" and "I don't want to live anymore." Tr. 51-52. She testified that she copes by going to church, and that she has worked "really hard" with a psychologist to try to stop the medications because their effects are so debilitating, but found that she cannot live without "my pills." Tr. 52-53. Other than to go to church, she testified that she does not leave the house. Tr.

54. When the ALJ asked whether she felt that "over the past couple of years . . . you are getting better, getting worse or staying the same," Plaintiff responded, "I feel like I'm the same." Tr. 59.

A vocational expert ("VE") was called to testify; he confirmed that Plaintiff's past work as a hair dresser and small business owner is skilled work at a light duty exertional level. Tr. 61. He then fielded five hypotheticals, all posed by the ALJ. Tr. 59-66. The first, based on the limitations in Dr. Hahn's mental RFC and Dr. Cylus's physical RFC, involved a claimant with the same age, education and work experience as Plaintiff; who would be limited to lifting and carrying fifty pounds occasionally and twenty-five pounds frequently; who could stand or walk six hours in an eight hour work day; who could sit six hours in an eight hour work day; who would be limited to occasional climbing of ramps, stairs, ladders, ropes and scaffolds; who could frequently kneel, crouch and crawl; who would be limited to understanding, remembering and carrying out simple routine tasks and instructions; who would be able to keep pace efficient to complete tasks and meet quotas typically found in simple, routine, unskilled work; who would be limited to occasional interaction with co-workers and supervisors; who would be unable to interact appropriately with the general public; who would be unable to perform team-oriented tasks or work in close proximity to co-workers; and who could tolerate only simple changes in work routine. Tr. 61-62. Based on the these limitations, the VE testified that the hypothetical claimant would not be able to perform Plaintiff's past relevant work, but that there would be other jobs available in the national and Rhode Island economies that she would be capable of performing, including cleaner, laundry worker and hand packer. Id.

The ALJ went on to ask the VE about four more hypothetical claimants, each with additional limitations. Tr. 63-66. The fourth hypothetical focused on mental limitations in the ability to sustain attention and concentration sufficient to perform even simple routine tasks, to

relate to other people in the work place and to tolerate customary work pressures in even simple work, all functions as to which Dr. Wold opined that Plaintiff suffers from "moderately severe" limitations. Tr. 64-65, 497-98. The VE testified that any one of these mental limitations would preclude all work. Tr. 65. However, the ALJ incorporated only the limitations in the first hypothetical into his RFC determination.

### B.    The ALJ's Decision

In his decision, the ALJ found that Plaintiff met the insured requirements of the Social Security Act ("the Act") through December 31, 2015. Tr. 17. He then proceeded through the familiar five-step inquiry. After concluding that she had not engaged in substantial gainful activity since the alleged onset date of January 1, 2011, at Step One, he proceeded to Step Two, where he found that depression and anemia qualified as severe impairments. Id. The ALJ considered Plaintiff's other physical diagnoses and found all of them non-severe because they cause no more than minimal limitations. Tr. 18. At Step Three, the ALJ found that neither of Plaintiff's severe impairments met the criteria of any listing. Id. The ALJ based his determination that Plaintiff's depression, in combination with her gastrointestinal symptoms, anemia and side effects of medications, did not meet the criteria for Listings related to 12.04 (Affective Disorders) on the finding that it had only moderate impact on her activities of daily living, social functioning and ability to maintain concentration, persistence and pace and had only resulted in one or two episodes of decompensation. Tr. 19. At Step Four, the ALJ concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), with the additional limitations the ALJ had incorporated into his first hypothetical. Tr. 19-25.

The ALJ's RFC finding took into consideration the functional limitations stemming from a combination of Plaintiff's physical and mental impairments. Tr. 20. While crediting that she suffers from depression and anxiety, has difficulty focusing on tasks, cannot live without her psychiatric medications, which make her dizzy and drowsy, and experiences fatigue and the sense of being "out of it" from anemia, as well as that she suffers from severe gastrointestinal issues, he nevertheless found that her statements concerning the intensity, persistence and limiting effects of her symptoms lacked credibility. Tr. 20. He grounded this adverse credibility determination principally on the lack of physical findings to support her complaints of severe abdominal pain, the control of her anemia through intravenous treatment and the lack of assistive devices or other assistance with activities of daily living. His finding that her social functioning is only moderately impaired was based on her frequent attendance at church. Tr. 23-24. He relied on her continued passive ownership of the hair salon as evidence that she can perform at least unskilled work in an isolated environment. Tr. 22.

The ALJ's analysis of Plaintiff's mental impairments relies heavily on her testimony at the hearing that "I feel like I'm the same" in response to his inquiry about how she has felt "over the past couple of years" "since what happened with your daughter" in December 2009. Tr. 22, 59. The decision uses this answer to find that certain of the evidence regarding Plaintiff's mental status in the pre-onset period of "early 2010" is "especially relevant" to the RFC determination. Ignoring other relevant evidence from the same time period,[8] the ALJ focused particularly on her mental condition at discharge from the psychiatric hospitalization at Rhode Island Hospital, erroneously characterizing the conclusion in the discharge summary as

---

[8] For example, the ALJ does not refer to the extensive Psychiatric Evaluation Report performed during intake at Rhode Island Hospital, when Plaintiff was assessed as functioning at a GAF of 30, denoting serious impairment and inability to function in almost all areas. See Tr. 22, 380.

"claimant appeared to be functioning essentially normally"[9] and mistakenly describing her seven-day hospital stay as "two days in the hospital." Tr. 22. While the ALJ acknowledged that Plaintiff's mood and depressive symptoms fluctuated during the years from 2010 to 2012, he found that declines in functioning were caused by "family stressors" and concluded that her baseline level of functioning – based on her condition in the absence of family stress – "appear[ed] more stable." Id. His finding that Plaintiff is only moderately limited as to concentration, persistence and pace was based on the Rhode Island Hospital discharge summary, which states that "[a]ttention and concentration were within normal limits," and "memory was intact." Tr. 24.

In making his RFC determination, the ALJ gave little weight to Dr. Wold's three opinions. Id. He based the determination to significantly discount the opinions of Plaintiff's treating psychiatrist on four reasons. First, he erroneously concluded that "Dr. Wold does not appear to be a psychiatric specialist, which reduces the persuasiveness of her opinion." Id. Second, he found that Plaintiff's level of functioning fluctuated, improving in the absence of family stress, rendering Dr. Wold's opinions inconsistent with the weight of the medical evidence from periods when she seemed to be doing better. Id. Third, he found Dr. Wold's opinion that Plaintiff's limitations in social functioning are moderately severe inconsistent with Plaintiff's constant attendance at church. Id. Finally, he relied on the lack of record references to displays of functional limitations during appointments with Dr. Wold, who therefore relied only on Plaintiff's subjective complaints. Id.

The ALJ afforded the greatest weight to the opinion of Dr. Hahn, a psychologist whose file review resulted in the opinion that Plaintiff could finish simple tasks over the course of a

---

[9] While Plaintiff was "[d]eemed to be stable" at discharge, the discharge summary assigned her a GAF score of 50, Tr. 389, which is far from functioning normally. DSM-IV-TR at 34 (GAF of 41 to 50 indicates "serious symptoms").

normal workday, despite some limitations.  The ALJ found that Dr. Hahn's opinion was more consistent with the weight of the evidence than three assessments prepared by Dr. Wold.  Tr. 24-25.  The ALJ also gave some weight to the opinion of Dr. Hughes, who performed his file review prior to the alleged onset of disability; he discounted only Dr. Hughes's conclusion that Plaintiff is capable of performing complex tasks because he did not have access either to medical evidence available by the time of the hearing or to Plaintiff's testimony regarding her subjective complaints.  Tr. 25.

At Step Five, the ALJ relied on the testimony of the VE to find that Plaintiff is capable of performing jobs that existed in significant numbers in the local and national economy.  Tr. 26.  Accordingly, the ALJ concluded that Plaintiff has not been disabled within the meaning of the Act since January 1, 2011.  Id.

## IV.  Issues Presented

Plaintiff presents three arguments:

1. The ALJ erroneously failed to give appropriate weight to Plaintiff's treating psychiatrist, Dr. Patricia Wold.

2. The ALJ erroneously found that Plaintiff's ownership of the hair salon implied the ability to work.

3. The ALJ misunderstood the significance of Plaintiff's regular church attendance.

## V.  Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is

good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

A Sentence Six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  Essential to the materiality requirement is that the new evidence relate to the time period for which benefits were denied; evidence reflecting a later-acquired disability or the subsequent deterioration of a previous non-disabling condition is not material.  Gullon ex rel. N.A.P.P. v. Astrue, No. 11-099ML, 2011 WL 6748498, at *10 (D.R.I. Nov. 30, 2011) (quoting Beliveau ex rel. Beliveau v. Apfel, 154 F. Supp. 2d 89, 95 (D. Mass. 2001) ("To be material, the evidence must be both relevant to the claimant's condition during the time period for which benefits were denied and probative.")).  The plaintiff bears the burden of demonstrating that a piece of new evidence is material.  See Evangelista, 826 F.2d at 139.

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be

severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505-1511.

### A.        Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical

evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545-1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.     The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. Id. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. Id. § 404.1520(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. Id. § 404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

C.      Evaluation of Mental Illness Claims

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique that assesses impairment in four work-related functions: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four.  See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July

2, 1996).  The ALJ must incorporate pertinent findings and conclusions based on the technique into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas.  Id. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court § 5:38 (2014).

### D.        Capacity to Perform Other Work

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991).  It is only when the claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to

preclude a wide range of employment at the given RFC indicated by the exertional limitations. Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

### E.    Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### F.    Pain

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's

six-part pain analysis and consider the following factors:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

> 4. Treatment, other than medication, for relief of pain;

> 5. Functional restrictions; and

> 6. The claimant's daily activities.

Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I.

Nov. 30, 2011).  An individual's statement as to pain is not, by itself, conclusive of disability.  42

U.S.C. § 423(d)(5)(A).  Guidance in assessing the credibility of the claimant's statement is

provided by the Commissioner's 1996 ruling.  SSR 96-7p, 1996 WL 374186 (July 2, 1996).

Credibility of an individual's statement about pain or other symptoms and their functional effects

is the degree to which the statement can be believed and accepted as true; in making this

determination, the ALJ must consider the entire case record and may find that all, only some, or

none of an individual's allegations are credible.  Id. at *4.  One strong indication of the

credibility of an individual's statements is their consistency, both internally and with other

information in the record.  Id. at *5-6.

**VII.    Application and Analysis**

**A.    ALJ's Treatment of Opinion Evidence**

The ALJ's treatment of the opinion evidence from treating psychiatrist, Dr. Wold, and the two agency psychologists, both of whom opined based on a file review, is tainted by error in three ways. First and most serious, the ALJ gave little weight to Dr. Wold based in part on the mistaken impression that she is not a psychiatrist. He also discounted her opinions based on his misinterpretation of the medical significance of the fluctuations in Plaintiff's functioning due to stress and of Plaintiff's constant attendance at church. Second, he afforded great weight to Dr. Hahn, whose opinion itself is tainted by the same error – she also thought Dr. Wold was a primary care physician. In addition, Dr. Hahn's opinion was formed without review of the mental health evidence from Dr. Wold and Dr. Busch that pertains to the period of alleged disability. Third, the ALJ erroneously afforded "some" weight to Dr. Hughes, whose evaluation did not consider any medical evidence from the relevant period.

The Commissioner does not dispute that Dr. Wold is a psychiatrist who was practicing psychiatry during the years when she was regularly treating Plaintiff. Instead, the Commissioner's principal argument is that this Court should excuse the ALJ's error because Plaintiff has the burden of proof and failed to submit evidence that Dr. Wold is a psychiatrist. The record undermines the Commissioner's argument – in it, the Rhode Island Free Clinic is identified as Plaintiff's primary care provider, while Dr. Wold is named as her psychiatrist. Tr. 551 ("PCP: RI Free Clinic . . . (psych there is Dr. Woll [sic])"). Although Dr. Wold's treatment notes do not specifically state that she is a psychiatrist, they make clear that she is the medical doctor who saw Plaintiff regularly for depression and prescribed medications to treat depression, evidence permitting the inference that she was practicing psychiatry. Cf. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) ("Not only is [the doctor] permitted by state law and

24

professional custom to practice psychiatry, by virtue of his treatment of [the patient's] condition,

including the prescription of psychotherapeutic drugs, he in fact was practicing psychiatry.");

Early v. Astrue, 1:09-CV-373-WTL-DML, 2010 WL 2977226, at *3 (S.D. Ind. July 26, 2010)

("Given that [the doctor] performed two of [claimant's] four back surgeries and treated him from

1992 until at least 2005, it is clear that [the doctor] was a treating physician.").  Plaintiff also saw

many other doctors at the Rhode Island Free Clinic who treated her for other conditions – that

Dr. Wold was the psychiatric specialist on the team, and not her primary care physician, may

also be inferred from the overall record, as well as Plaintiff's list of medications, which identifies

Dr. Wold as the prescribing physician for only two of twelve, both prescribed to treat depression.

T. 671.  Confirming Dr. Wold's status as a psychiatrist, Plaintiff's attorney argued at the hearing

that the severity of Plaintiff's mental illness is evidenced by the fact that she "continued"

treatment with Dr. Wold on a monthly basis after she was hospitalized for depression.[10]  Tr. 41-

42.

     The ALJ's error in failing to recognize Dr. Wold as a psychiatrist may well have been

caused by his reliance on Dr. Hahn, whose opinion also erroneously identifies Dr. Wold as

Plaintiff's "PCP."  Tr. 86.  The significance of the error is clear from the ALJ's decision that

recites that "Dr. Wold does not appear to be a psychiatric specialist, which reduces the

persuasiveness of her opinion."  Tr. 24.  As the applicable regulations make clear, lack of

specialization in the medical conditions at issue is a factor to be considered in weighing a

---

[10] In her Memorandum, Plaintiff supplements this evidence with an internet link establishing that Dr. Wold not only is a psychiatrist, but is a Clinical Assistant Professor Emerita of Psychiatry and Human Behavior at Brown University Medical School.  See Patricia N. Wold, https://vivo.brown.edu/display/pwoldmd (last visited Aug. 20, 2014).  Where the administrative record itself establishes Dr. Wold's status as a psychiatrist and the Commissioner does not dispute her credentials, there is no need for this Court to determine whether this readily accessible public information about Dr. Wold is susceptible of judicial notice, Minnesota v. First Nat. Bank of St. Paul, 273 U.S. 561, 567 (1927), whether consideration of it at this phase of this matter is improper because it was before the Appeals Council but not the ALJ, Tr. 234; see Mills v. Apfel, 244 F.3d 1, 5-7 (1st Cir. 2001), or whether the Appeals Council's decision itself requires remand based on this evidence, Evangelista, 826 F.2d 139-43.

treating physician's opinion when, as in this case, it is not afforded controlling weight by the ALJ.  20 C.F.R § 404.1527(c).

The inaccurate finding that Dr. Wold is not a psychiatric specialist, which the ALJ used to discount the persuasiveness of her opinion and afford it little weight, constitutes reversible error.  It is well settled that when the ALJ rejects or discounts opinion evidence based on a factually incorrect reason, the ALJ's finding is not supported by substantial evidence.  King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980) ("Even if legitimate reasons exist for rejecting or discounting certain evidence, the Secretary cannot do so . . . for the wrong reason."); Persico v. Barnhart, 420 F. Supp. 2d 62, 75 (E.D.N.Y. 2006) (remand because ALJ failed to afford weight to treating physician opinion as that of a specialist; therefore, ALJ's conclusion not based on substantial evidence).  Utilizing this bedrock principle, courts regularly remand cases when the ALJ decides not to accept an opinion for the mistaken reason that the treating source is not a specialist.  See, e.g., King, 615 F.2d at 1019-20 (remand because Secretary rejected opinions of radiology specialist based on mistaken finding that they were not certified and relied instead on less qualified radiologists); Martin v. Comm'r of Soc. Sec., 6:11-CV-55, 2013 WL 654359, at *4 (W.D. Va. Feb. 1, 2013) (remand required when ALJ mistakenly believed claimant had not been referred to a mental health specialist).

When an opinion is rejected based on a fundamental error like the source's status as a specialist, even if other appropriate reasons are given, it is impossible for the Court to determine how much the error corrupted the ALJ's determination to ascribe a certain weight to the opinion. Morgan v. Colvin, 531 F. App'x 793, 795 (9th Cir. 2003) (court "cannot know" whether ALJ would have given weight to opinion based on mistaken belief that source was a physician); Kemp v. Comm'r of Soc. Sec., 11-14224, 2013 WL 1303520 (E.D. Mich. Feb. 6, 2013)

("entirely speculative" to determine weight given to opinion if source properly identified as treating medical doctor); <u>Thomas v. Astrue</u>, No. 1:11-cv-01291-SKO, 2013 WL 204745, at *17 (E.D. Cal. Jan. 17, 2013) (remand required because ALJ mistakenly concluded treating physician opined based on record prior to onset of disability); <u>Martin</u>, 2013 WL 654359, at *5 (impossible to know whether ALJ's decision would have changed if he recognized that claimant was treating with psychiatrist). Such is the case here – an ALJ should "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist," 20 C.F.R. § 404.1527(c)(5). The Court can only guess how Dr. Wold's status as a psychiatrist might have impacted the ALJ's decision to afford her opinion little weight.

Several of the ALJ's other reasons to discount significantly Dr. Wold's opinions are also flawed. For example, the ALJ erred in finding that Dr. Wold's opinions are inconsistent with the weight of the medical evidence because Plaintiff's ability to go to church is evidence that she does not suffer from moderately severe limits in social functioning. In making this finding, the ALJ improperly relied on his own interpretation as a layman and ignored the medical opinion of Dr. Busch, the treating psychologist, that Plaintiff's church attendance was perpetuating her mental illness. Tr. 535 ("limiting her life to . . . church and home . . . will cause her to continue to be depressed"); <u>see</u> <u>Ramos v. Barnhart</u>, 60 F. App'x 334, 336 (1st Cir. 2003) (per curiam) (ALJ cannot substitute his own lay opinion for uncontroverted medical evidence); <u>Gordils v. Sec'y of Health & Human Servs.</u>, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) (ALJ can make common sense judgments on functional capacity, but cannot overstep the bounds of lay person's competence and render medical judgment).

The ALJ also erred in effectively substituting his own judgment for Dr. Wold's medical opinion in concluding that Plaintiff's mental fluctuations, with declines linked to family stressors, constitutes evidence of improved functioning in the absence of stress. This finding is error in that it fails to consider that such fluctuations are one of the symptoms of the disease. DSM-5 at 155, 183-84; Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) (symptoms that "wax and wane" are consistent with depression). Seizing on Plaintiff's vague testimony that she felt "the same" over the "past couple of years," the ALJ selectively focused on the claimant's improved condition at the time of discharge from a psychiatric hospitalization and assumed that without "family stressors," her condition would be "more stable" and "relatively normal[]." Tr. 22. This reasoning is flawed "because one would expect a patient with severe mental impairments to improve upon a course of treatment in a structured hospital environment." Harlin v. Astrue, 424 F. App'x 564, 568 (7th Cir. 2011). The ALJ's error is exacerbated by his misunderstanding of the seriousness of Plaintiff's illness as reflected in his mistaken conclusion that Plaintiff was hospitalized for depression for only two days, Tr. 22, when the psychiatric hospitalization lasted for a total of seven. Tr. 374, 387.

The errors underpinning the minimal weight given to the opinions of Plaintiff's treating psychiatrist are compounded by the ALJ's reliance instead on the flawed opinion of Dr. Hahn, who did not examine Plaintiff. See 20 C.F.R. § 404.1527(c)(2) (treating opinion generally entitled to more weight than consulting opinion). Dr. Hahn's opinion was prepared on April 20, 2011, just four months after Plaintiff's onset of disability, and specifically relies on Dr. Wold's first opinion, which Dr. Hahn misinterprets as the opinion of a "PCP." Dr. Hahn cherry-picks Dr. Wold's assessments, ignoring the critical functions that Dr. Wold opined were subject to severe or moderately severe limitations, focusing only on the functions that Dr. Wold assessed as

moderately impaired. Tr. 86-92. This error is not surprising – apart from Dr. Wold's first opinion and a single record signed by Dr. Busch on February 21, 2012, the file reviewed by Dr. Hahn did not include any of the records reflecting Plaintiff's extensive mental health treatment with Dr. Busch and Dr. Wold during the relevant period, when Plaintiff's condition worsened to the point that she was unable to work at all. In particular, Dr. Hahn saw almost none of Dr. Wold's treatment notes.

While an ALJ should consider all evidence in the medical record, 20 C.F.R. § 404.1520(a)(3), it is error to rely on an opinion from a reviewing source like Dr. Hahn who reviewed medical evidence from before Plaintiff alleged she became disabled, but saw almost none of the records from the relevant period. See Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam) (error to rely on state agency consultant whose opinion was irrelevant to most of the disability period); Hall v. Colvin, C.A. No. 13-169-M, 2014 WL 1832184, at *9 (D.R.I. May 6, 2014) (reliance on opinion based on review of incomplete record is error when condition worsens). When, as here, the consultant's opinion is based on an incomplete medical record, the First Circuit has counseled that controlling weight should not be afforded to such opinions. Alcantara, 257 F. App'x at 334; see also Padilla v. Barnhart, 186 F. App'x 19, 22 (1st Cir. 2006) (per curiam). With Dr. Hahn's defective opinion as the primary foundation for the ALJ's RFC finding, the ALJ's determination that Plaintiff is not disabled under the Act is not adequately supported by substantial evidence. Cruz v. Astrue, CA 11-638M, 2013 WL 795063, at *18 (D.R.I. Feb. 12, 2013) (RFC finding not supported by substantial evidence when based on faulty state agency physician opinion); Lopez v. Astrue, 805 F. Supp. 2d 1081, 1092 (D. Colo. 2011) (erroneous reliance on opinion of non-physician leaves RFC without substantial support in evidence).

While this is enough to require remand, it must be noted that the ALJ also erred in affording "some" weight to a consulting psychologist, Dr. Hughes, whose file review was entirely limited to the period prior to the alleged onset of disability and whose conclusion that Plaintiff can perform complex tasks was acknowledged by the ALJ as inconsistent with the evidence. Tr. 25. See Alcantara v., 257 F. App'x at 334; Hall, 2014 WL at *9. While the ALJ afforded only "some" weight to Dr. Hughes, even that quantum of consideration is error for an opinion so totally lacking any indicia of reliability.

These errors are not harmless – the record does not contain an opinion from another qualified source that supports the ALJ's RFC finding. See Krouch v. Astrue, No. 1:11cv01599 DLB, 2012 WL 5343082, at *8-9 (E.D. Cal. Oct. 26, 2012) (mistake harmless because ALJ could rely on contradictory opinion from treating psychologist and psychiatrist opinion discounted based on error was conclusory and inconsistent with treatment records); see Bennett v. Astrue, No. C12-836-JCC-JPD, 2013 WL 503933, at *6 (W.D. Wash. Jan. 18, 2013) (error in reliance on non-medical opinion harmless because ALJ also relied on corroborating opinion of qualified medical source). There are no treating or examining source opinions on Plaintiff's functional limitations in the medical record besides those of Dr. Wold. These errors are also material to the outcome of this matter – the VE opined to available work based on the hypothetical grounded in Dr. Hahn's opinion, but testified that there would be no work for a claimant limited as described in Dr. Wold's opinions. Tr. 61-62, 65. Consequently, this matter should be remanded for reassessment of the relevant opinion evidence. See Morgan v. Colvin, 531 F. App'x 793, 794-95 (9th Cir. 2013) (when ALJ discounts treating physicians and improperly accords substantial weight to opinion of non-physician, remand required).[11]

---

[11] If the ALJ had accepted Dr. Wold's opinion, he would then have had to consider whether there should be an award of disability benefits at Step Three of the sequential evaluation process because Plaintiff potentially meets the

## B. The ALJ's Erroneous Reliance on Ownership Of Hair Salon

Plaintiff challenges the ALJ's reliance on her continued ownership of the hair salon, which she had managed and where she had worked prior to the onset of disability, to support his conclusion she can "perform at least unskilled work in an isolated environment." Tr. 22. In making this finding, the ALJ acknowledged that the record reflects that Plaintiff not only stopped working but also transferred responsibility for the business to her son. Id. This finding is corroborated by the testimony at the hearing in response to a series of questions about whether Plaintiff had any ongoing duties as an owner of the salon – she testified that she used to run the business, including hiring and firing, filing tax returns, ordering supplies and handling advertising, but that during 2011 and 2012 she had no involvement with the business whatsoever, including no involvement in making business decisions. Tr. 48-50.

In the face of this well-supported finding, it was error for the ALJ nevertheless to find that passive ownership alone, with no concomitant duties or responsibilities, somehow translates into evidence of the ability to work. Weiland v. Barnhart, 239 F. Supp. 2d 875, 890 (N.D. Iowa 2002) ("the owner of a business may derive substantial income from the business without losing his disability benefits so long as he is not actively engaged in managing the business"); see Ogle v. Barnhart, 123 F. App'x 361, 364 (10th Cir. 2005) (ownership of business and maintenance of tax records by itself is not substantial gainful activity); Verduchi v. Astrue, CA No. 05-388T,

---

Paragraph B criteria for Listing 12.04 (Affective Disorders). See 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, Appendix 1 (Listing 12.04). Dr. Wold opined that Plaintiff's limitations were at least "moderately severe" (defined as "an impairment which seriously affects ability to function") with respect to Plaintiff's ability to relate to other people, social functioning, responding to supervision, attending and concentrating in the work setting and responding to customary work pressures (attendance, persistence, pace and productivity). Tr. 483, 487, 497. A claimant meets the Paragraph B criteria for Listing 12.04, and therefore qualifies for disability benefits, when a "marked limitation" (defined as a "limitation [that] . . . interfere[s] seriously with your ability to function independently, appropriately, effectively, and on a sustained basis") is present for at least two of the following: activities of daily living; maintaining social functioning; or maintaining concentration, persistence or pace. 20 C.F.R. Part 404, Appendix 1 (Listing 12.04); see Young v. Comm'r of Soc. Sec., 322 F. App'x 189, 190 (3d Cir. 2009).

2009 WL 30307, at *7 (D.R.I. Jan. 5, 2009) (when ownership of business involves work activity that "clearly involved significant physical or mental activities for pay or profit," it may be considered as evidence contrary to claim of disability); 3 Soc. Sec. Law & Prac. § 40:36 (2014) (mere ownership of and receipt of income from business, even if it was established and formerly run by claimant, does not establish substantial gainful activity).

**C.     The ALJ's Misinterpretation of Plaintiff's Regular Church Attendance**

Plaintiff correctly contends that the ALJ committed error in his reliance on her ability to go to church as evidence that she has only moderate difficulty in interacting with others.  Tr. 23-24.  This error is significant because church attendance is essentially the only support marshaled by the ALJ for this critical finding.  More importantly, as discussed *supra*, the ALJ also relied on Plaintiff's church-going as evidence inconsistent with Dr. Wold's opinion that Plaintiff's social functioning limitations are moderately severe to severe.  Tr. 24.

The significance that the ALJ places on this evidence is belied by the treatment notes of Dr. Busch, a psychologist who saw Plaintiff twenty-seven times; they make clear that he found Plaintiff's self-isolation by either staying home or spending hours per week at church was pathological behavior that exacerbated her depression.  See, e.g., Tr. 535 ("limiting her life to . . . church and home . . . will cause her to continue to be depressed"); Tr. 688 (persistent avoidance of leaving the house except to attend church daily "is maintain [sic] her depression"); Tr. 690 ("Discussed how limiting her life to places she feels comfortable (i.e. church and home) will cause her to continue to be depressed").  The ALJ's disregard of this medical evidence from a competent treating source, substituting instead his own interpretation, is error.  Hoyt v. Colvin, 553 F. App'x 625, 627 (7th Cir. 2014); see Nelsen v. Barnhart, No. C 00-2986 MMC, 2003 WL 297738, at *4 (N.D. Cal. Feb. 4, 2003) ("ALJ . . . may not substitute his own view of the effects

of a mental impairment on a claimant for that of an examining psychologist."). Further, this error leaves this critical finding – that Plaintiff's ability to relate to others is only moderately limited – unsupported by substantial evidence.

**VIII.    Conclusion**

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse, without or, Alternatively, with Remand for a Rehearing, the Commissioner's Final Decision (ECF No. 9) be GRANTED and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 11) be DENIED.  I further recommend that this Court remand this matter under Sentence Four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this report and recommendation, and that final judgment enter in favor of Plaintiff.

Any objections to this report and recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and of the right to appeal the Court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 21, 2014